## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. SHAWN JACKSON | : CIVIL ACTION NO. 2:23-cv-3170 |
| 970 Upper Gulph Road | : |
| Wayne, PA 19087 | : |
| **PLAINTIFF** | : |
| v. | : |
| TEMPLE UNIVERSITY-OF THE | : |
| COMMONWEALTH SYSTEM OF | : |
| HIGHER EDUCATION | : |
| 1852 North 10th Street | : |
| Philadelphia, Pennsylvania, 19122 | : |
| **DEFENDANT** | : JURY TRIAL DEMANDED |

## COMPLAINT

Dr. Shawn Jackson ("Dr. Jackson" or "Plaintiff"), through undersigned counsel, files this complaint against Temple University- of the Commonwealth System of Higher Education ("Temple" or "Defendant"), and avers as follows:

## JURISDICTION AND PARTIES

1. The original jurisdiction of this Court is invoked pursuant to 28 U.S.C.§§1331 and 1337, and the claims are substantively based on violation of the Family and Medical Leave Act, 29 U.S.C. §2601 et seq.. This Court has supplemental jurisdiction over the subject matter of the claims brought under state laws pursuant to 28 U.S.C. § 1367 because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 as the events giving rise to Plaintiff's claims occurred in this district.

3. All conditions precedent to the institution of this suit have been fulfilled. Plaintiff's Right to Sue Letter is attached as Exhibit "A".

4. Dr Jackson is an adult individual who resides at 970Upper Gulph Road, Wayne, PA 19087.

5. Dr. Jackson is a nurse practitioner with nearly 30 years of experience.

6. Temple was and is a corporation duly organized and existing under state law that acted as Plaintiff's employer, that does significant business within the Commonwealth of Pennsylvania, and is engaged in an industry affecting commerce.

7. Temple has a location at 1852 North 10th Street, Philadelphia, Pennsylvania 19122, where Dr. Jackson was employed.

8. At all times material hereto, Temple employed more than five hundred individuals.

9. At all times material hereto, Temple acted by and through its authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendant and in furtherance of Defendant's business.

10. At all times relevant hereto, Temple acted as a "person" and "employer" within the meaning of one or more of the anti-discrimination laws at issue in this suit and is accordingly subject to the provisions of said laws. Plaintiff Dr. Jackson was an "employee" of Temple within the meaning of the anti-discrimination laws at issue in this suit and is accordingly entitled to the protections of said laws.

**FACTS**

11. Dr. Jackson has an Associate's degree in business administration from Delaware County Community College, a Bachelor's of Science in Management, with a minor in Human Resources, from Widener University; a Bachelor's of Science in Nursing from Neumann

College; a Master's of Science in Nursing from Temple; and a Doctorate in Nursing Practice, also from Temple.

12. Prior to joining Temple's staff, Dr. Jackson's work experience included work as a nurse practitioner, as well as time spent as an emergency room nurse, critical care staff nurse, lung transplant coordinator, nurse manager, emergency room nurse, charge nurse, and nursing supervisor.

13. In October of 2018, Dr. Jackson was hired by Temple's College of Public Health as an assistant professor on the clinical track.

14. Dr. Jackson was hired on a one-year contract for the 2018-2019 school year, a contract which was renewed the following spring.

15. During the 2018-2019 school year, Dr. Jackson took on a variety of responsibilities at Temple. Dr. Jackson served as the Medical Director of Temple's Vaux Community Health Clinic, a community-based nurse managed clinic where Dr. Jackson assisted students with evaluating, diagnosing, treating, and referring patients to consultants based on their needs, educating patients and their family members about preventative care, and serving as a patient advocate and primary healthcare provider for an underserved population.

16. Dr. Jackson also co-taught Clinical Assessment and Diagnosis in Advance Practice Nursing and Primary Care of Children for the nursing practice doctoral program at the College.

17. On February 27, 2019, Temple offered Dr. Jackson another one-year contract with the College, which she accepted.

18. In the Fall of 2019, Dr. Jackson was the primary instructor for "Primary Care of Adults I Theory," a graduate level course, while also working at the Vaux Clinic.

19. In her annual faculty evaluation for '19-'20 school year, Dr. Jackson's teaching was rated a 4.9 out of 5, based on criteria like student feedback, her expertise in teaching, availability to students and more. In recognition of her merit, then-Dean Siminoff recommended Dr. Jackson for a merit salary award for her exemplary performance.

20. When the Covid-19 pandemic began in March 2020, the Vaux Clinic moved temporarily from in-person to telehealth, and then subsequently closed entirely that spring. During this period, Dr. Jackson was teaching at the graduate level as the primary instructor for "Health Economics and Business Practices in Primary Healthcare."

21. In June 2020, after the decision to close the Vaux Clinic had been made, Temple offered Dr. Jackson a two-year contract, which she accepted.

22. With the closure of clinic, Dr. Jackson began performing site visits for students working in the field, and continued teaching in the classroom.

23. In the Spring of 2021, Dr. Jackson taught "Health Economics and Business Practices in Primary Healthcare," again at the graduate level.

24. Once again, Dean Siminoff recommended Dr. Jackson for a merit salary award.

25. In addition to the clinical and teaching duties that Dr. Jackson performed between the Fall of 2018 and Spring of 2021, she also contributed to the International Blue Cross Foundation Healthcare Scholars Pipeline program for underserved students in the Philadelphia area, work which received regional media attention.[1]

26. The program sought to reach so-called "nontraditional students" for admission to the College – students who ordinarily might not have access and exposure to Temple's nursing program.

---

[1] *See* https://news.temple.edu/news/2021-10-13/pipeline-nursing-students-color.

27. Dr. Jackson also participated in community outreach with the Philadelphia Housing Authority ("PHA"), educating PHA residents about diabetes, chronic tension, pain, disease processes and non-medical pathways to health.

28. During her tenure, Dr. Jackson was honored with an invitation to serve as a marshal at graduation, and was nominated by the University and her peers to serve on four different faculty committees: "Diversity, Equity, Inclusion, and Belonging," "Program Evaluation," "Faculty Affairs," and "Lab and Simulation."

29. In the summer of 2021, Dr. Jackson suffered a serious head injury that required hospitalization. (Her significant concussion and post-concussion syndrome required her to recover for three months.

30. Dr. Jackson went on paid Family and Medical Leave Act ("FMLA") leave beginning August 16, 2021.  Paid leave was exhausted on October 15, 2021, and Dr. Jackson was transitioned to half-pay, per Temple policy, on October 16, 2021.

31. Dr. Jackson's medical provider originally projected that she would be able to return to work by mid-November; ultimately, she was not able to return to work until January 15, 2022.

32. Dr. Jackson remained on half pay from October 16 until the date of her return in or around January of 2022.  At that time, her physicians cleared her to work four hours per day, twice per week, with accommodations and rest periods as needed.  Over time, she was able to progress to four hours per day, five days per week. Eventually, she was able to work six hours per day, five days per week. During that period, Dr. Jackson taught three undergraduate courses at the College: two sections of "Nursing and Healthy Lifestyles Management" and one section of "Generalist Nursing Practice Internship."

33. On March 16, 2022, Dr. Mary Tehrhaar, then-chair of the Department of Nursing, sent a letter to Dr. Jackson extolling her efforts during the previous year, acknowledging that she was "unable to teach in the fall due to due to [her] injury," and "carried a modified load as [she] continue[d] to recover," and noting that "all [her] colleagues were happy to have [her] return in January for the spring semester." This letter was also sent to then-Dean Siminoff.

34. Dr. Terhaar, who was responsible for oversight of curriculum, quality of instruction, staffing, resources, and accreditations, advocated for Dr. Jackson to be renewed on a one-year contract and began the process of assigning her courses for the Fall of 2022 semester. Dr. Terhaar thought very highly of Dr. Jackson; though she had initially been recruited to work for the Vaux Clinic, Dr. Jackson had, in Dr. Terhaar's view, become vital to the preparation and training of doctoral and undergraduate students. Students, community partners, and faculty all enjoyed working with her.

35. In the Spring of 2022, specifically, as decisions about staffing for the upcoming academic year loomed, Dr. Terhaar found her Department short staffed and desperately in need of faculty.

36. Amy Bieda ("Bieda"), Undergraduate Program Director in the Department from 2021-2022, testified that there was a desperate need for Dr. Jackson's skillset in the Fall of 2022. She was "an excellent faculty member," according to Bieda, capable of teaching health assessment classes, healthy lifestyle, and a variety of other graduate and undergraduate classes. Bieda had no concerns about Dr. Jackson's performance or teaching abilities.

37. In the Spring of 2022, Dr. Terhaar communicated her concerns about being short-staffed to Siminoff and to Ross Silverman ("Silverman"), Associate Dean for Faculty Affairs, as well as her desire to renew Dr. Jackson. Dr. Terhaar found that Siminoff and Silverman were

hostile to the idea of renewing Dr. Jackson. Siminoff insisted that Dr. Jackson's health would prevent her from being able to contribute to the College, even as Dr. Terhaar reported that her work was being done well, and she had already begun to ratchet up her workload.

38. Finally, Siminoff told Dr. Terhaar that did not intend to renew Dr. Jackson's employment, over Dr. Terhaar's objection. Dr. Terhaar was upset by the decision; Dr. Jackson had strong teaching evaluations, she was prepared to teach the classes she had already been assigned for the upcoming school year, and there was a shortage of qualified faculty at the College.  On March 30, 2022, Dr. Jackson received a letter from Silverman, informing her that she would not receive a contract offer for the 2022-2023 school year.

39. Asked whether there was a role for Dr. Jackson in Spring of 2022, Lisa Johnson ("Johnson"), former Director of the Graduate Program in the Department, testified: "Emphatically yes." The same was true of the upcoming 2022-2023 school year.

40. Temple misled the PHRC in the belief that Dr. Jackson's position was eliminated. In its statement to the PHRC dated October 14, 2022, Temple alleged, *inter alia*, that:

> Respondent originally hired Complainant to work as full-time clinical faculty at the nurse-led Vaux Clinic… during the COVID-19 pandemic, the Vaux Clinic was indefinitely closed as a primary care clinic. Around this same time, the Nursing Department reorganized its curriculum to better align with accreditation and state standards for training. Specifically, the Nursing Department moved away from curriculum based in primary care clinic settings.
>
> \*\*\*
>
> Accordingly, on March 30, 2022, the College of Public Health notified Complainant that it would not renew her contract, and her employment would end on June 30, 2022.

41. However, Dr. Jackson did not work at the Vaux Clinic at the time of the termination but a the College of Public Health.  Rather, *Temple proceeded to advertise for full*

*time faculty positions at the College of Public Health despite Dr. Jackspon's qualifications for a continued position .*

42. The decision not to "renew" Dr. Jackson's contract was not due to any shift in curriculum or reorganization of any department.  The termination was due to Dr. Jackson's request for a reasonable accommodation and the exercise of her FMLA rights.  Therefore, Temple's  decision to not renew dr. Jackson's contract was pretextual.

## COUNT I
## UNLAWFUL RETAILIATION FOR EXERCISING FMLA RIGHTS
## PLAINTIFF V. TEMPLE UNIVERSITY

43. The above paragraphs are incorporated as though set forth herein at length.

44. Temple retaliated against Dr. Jackson for availing herself of contractually-guaranteed FMLA leave.

45.  By and through its course of conduct as aforesaid, Temple violated FMLA by interfering with Dr. Jackson's rights under FMLA and terminating her employment, all in retaliation for Dr. Jackson taking FMLA leave and exercising her FMLA rights.

46. The FMLA prohibits "[u]sing an employee's request for or use of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions."[2] Per McDonnell Douglas Corp. v. Green, discrimination may be inferred when an employer fails to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  411 U.S. 792, 802-4 (1973); see also Marshall v. The Rawlings Company LLC, 854 F.3d 368, 379 (6th Cir. 2017) ("The McDonnell Douglas burden-shifting framework applies to claims of FMLA retaliation based on indirect evidence.")  If the defendant can articulate a legitimate nondiscriminary reason, the plaintiff has the burden of demonstrating that the reason offered is

---

[2] https://www.dol.gov/agencies/whd/fact-sheets/77b-fmla-protections

pretextual. *Marshall,* 854 F.3d at 379. A plaintiff establishes pretext "by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir. 2012).

47. Temple cannot state a coherent reason for its decision to end Dr. Jackson's employment.

48. Dr. Terhaar testified that she was told by Dean Siminoff that Dr. Jackson's health would prevent her from contributing as an employee in the coming school year. Siminoff did not deny making this statement.

49. Further, in monthly meetings, Siminoff would often bring up Dr. Jackson's health, and Terhaar would push back – taking the position that Dr. Jackson's health had improved from her return to work in January, and would continue to improve. These comments by Siminoff show animus toward Dr. Jackson for her use of medical leave to recover from her injury, and doubt around Dr. Jackson's capacity as an employee due to her need for a medical leave of absence.

50. Notably, Temple ended Dr. Jackson's tenure after four years in which she had earned the respect and admiration of her colleagues and superiors, won merit awards for her performance, earned invitations to serve as a graduation marshal and on multiple faculty committees, worked on special programs with the Vaux Clinic and the IBC, and taught courses to undergraduate and graduate students. During her fourth and final school year, she took FMLA leave from August 2021 to January 2022. Two months later, as she was returning to her normal capacity as quickly as she was medically cleared to do, she was informed that she would not be renewed, notwithstanding the shortage of faculty in the Department, the Department Chair's stated need and desire for Dr. Jackson's skills in the Department, and Dr. Jackson's capacity to

9

teach at all levels (both undergraduate and graduate). The only intervening factor between Temple's decision to renew Dr. Jackson on a two-year contract in June 2020 and not to renew her in March 2022 was Dr. Jackson's use of FMLA leave.

51. Siminoff claimed repeatedly that Dr. Jackson's initial hiring had been in connection with the Vaux Clinic, and that once the Vaux Clinic closed, there was no longer a need for her. This stands in stark contrast with the fact that Dr. Jackson had been classroom teaching in both the graduate and undergraduate programs in previous years, and that her classroom teaching had received uniformly positive reviews from her peers, superiors and students.

52. Further, Temple renewed Dr. Jackson in the Spring of 2020 on a two-year contract, *after* the Vaux Clinic had been slated for closure due to the pandemic. Therefore, Temple's claim that Dr. Jackson's role at Temple was exclusively to operate the clinic and once the Clinic closed, there was no place for her, is contradicted by the fact that Temple had hired her on a two-year contract even with the knowledge that the Clinic was closing.

53. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by Temple, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self- esteem, plus permanent and irreparable harm, resulting in the loss of her employment, which caused her to sustain a loss of earnings, plus the value of certain benefits, plus loss of future earning power, plus back pay, and front pay and interest due thereon.

WHEREFORE, Plaintiff Dr. Shawn Jackson requests that this Court enter judgment in her favor and against the Defendant Temple University, and Order that:

    a.    Defendant compensate Plaintiff for the wages and other benefits and emoluments of employment lost, because of its unlawful conduct;

      b.      Defendant compensate Plaintiff with an award of front pay, if appropriate;

      c.      Defendant pay to Plaintiff punitive damages, liquidated damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

      d.      Defendant pay to Plaintiff pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

      e.      The Court award such other relief as is deemed just and proper.

**COUNT II**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. §§ 12111−12117, and 29 C.F.R. Part 1630**
**PLAINTIFF V. TEMPLE UNIVERSITY**

54.      Plaintiff incorporates herein by reference and makes a part hereof the preceding paragraphs as fully as though the same were set forth herein at length.

55.      Title I of the ADA, 42 U.S.C. §§ 12111−12117, and its implementing regulation, 29 C.F.R. Part 1630, prohibit covered entities, such as Temple, from discriminating against qualified individuals on the basis of disability in regard to the discharge of employees and other terms, conditions, and privileges of employment, including by failing to provide reasonable accommodations to qualified employees with disabilities.

56.      Plaintiff is a person with a disability because he has physical impairments that substantially limit one or more major life activities, including lifting and bending, and/or the operation of major bodily functions, *e.g.,* the walking and bending; and/or has a record of such impairments.  42 U.S.C. § 12102; 29 C.F.R. § 1630.2(g)-(k)

57. During all relevant times, Plaintiff was qualified for a teaching position because she could perform the essential functions of the job with reasonable accommodations. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).

58. Temple discriminated against Plaintiff in violation of Title I of the ADA, 42 U.S.C. §§ 12111-12117, and its implementing regulation, 29 C.F.R. Part 1630, by not making reasonable accommodations to the known physical limitations of Plaintiff, and then terminating her on the basis of disability. 42 U.S.C. §§ 12102, 12111, 12112; 29 C.F.R. §§ 1630.2, 1630.4, 1630.9.

59. When the request for reasonable accommodations was made and Dr. Jackson was terminated, Temple knew of her physical limitations.

60. Reasonable accommodations include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position;" and "[j]ob restructuring; . . . appropriate adjustment or modifications of . . . training materials, or policies; . . . and other similar accommodations for individuals with disabilities." 29 C.F.R. § 1630.2(o)(1)(ii), (2)(ii).

61. Temple could have reasonably accommodated the Plaintiff's physical limitations.

62. Pursuant to Title I's implementing regulation, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).

63. As a result of Temple's discriminatory conduct, Dr. Jackson suffered and continues to suffer damages, including emotional distress.

WHEREFORE, Plaintiff Dr. Shawn Jackson requests that this Court enter judgment in her favor and against the Defendant Temple University, and Order that:

    a. Defendant compensate Plaintiff for the wages and other benefits and emoluments of employment lost, because of its unlawful conduct;

    b. Defendant compensate Plaintiff with an award of front pay, if appropriate;

    c. Defendant pay to Plaintiff punitive damages, liquidated damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

    d. Defendant pay to Plaintiff pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

    e. The Court award such other relief as is deemed just and proper.

**COUNT III**
**PENNSYLVANIA HUMAN RELATIONS ACT AS AMENDED**
**43 P.S. §951, et seq.**
**PLAINTIFF V. TEMPLE UNIVERSITY**

64. Plaintiff incorporates herein by reference and makes a part hereof the preceding paragraphs as fully as though the same were set forth herein at length.

65. Temple by the above discriminatory and improper acts has violated the Pennsylvania Human Relations Act, as amended, 43 P.S.§951, et seq.

66. As a direct and proximate result of Defendant's improper and discriminatory conduct, Plaintiff has suffered and continues to suffer from lost earnings, both past and future, lost earning capacity, and the loss of other benefits.

67. In addition to earning and benefit losses, Plaintiff has, and continues to suffer from emotional upset, mental anguish and humiliation, loss of life's pleasures and pain and suffering

WHEREFORE, Plaintiff Dr. Shawn Jackson requests that this Court enter judgment in her favor and against the Defendant Temple University, and Order that:

    a. Defendant compensate Plaintiff for the wages and other benefits and emoluments of employment lost, because of its unlawful conduct;

    b. Defendant compensate Plaintiff with an award of front pay, if appropriate;

    c. Defendant pay to Plaintiff punitive damages, liquidated damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

    d. Defendant pay to Plaintiff pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

    e. The Court award such other relief as is deemed just and proper.

Respectfully submitted,

**ROBERT J. BIRCH, ESQ., PC**

August 17, 2023        BY: _____

Robert J. Birch, Esquire
PO Box 1133
North Wales, PA 19454
610-277-9700

EXHIBIT A



**pennsylvania**
HUMAN RELATIONS COMMISSION

May 19 2023

Shawn Jackson
970 Upper Gulph Rd
Wayne, PA 19087

RE: Shawn Jackson vs. Temple University
PHRC Case No. 202102401

Dear Shawn,

It has been at least one year since you filed your complaint with the Pennsylvania Human Relations Commission. This is to notify you that you now have the right to bring an action in the appropriate Pennsylvania Court of Common Pleas based on the alleged violations of the PHRAct contained in your Commission complaint. This right is provided under Section 12(c) of the Human Relations Act, 43, P.S. § 962(c).

Please be advised that you are not required to file such an action in the State Court of Common Pleas. The Commission is continuing to process your case, and we will make every effort to resolve it as soon as possible. If we are not notified otherwise, we will assume that you want the Commission to continue handling your case.

If you do file a complaint in a Court of Common Pleas, the Commission will dismiss your complaint. This means that you will be unable to have the Commission decide your case even if your complaint is dismissed in State Court because of a procedural error. Procedural errors may include filing the complaint in State Court in the wrong county or filing in State Court after your time to file has expired. For this reason, you should make every effort to assure that any complaint you file in State Court will be properly filed before you file it.

If you believe you might want to take your case to State Court, we suggest that you consult a private attorney about representing you in that action. This should be done before you file the complaint so that your attorney may advise you on the best course of action for you to take.

Should you file a complaint in State Court, you are required by Section 12(c)(2) of the Pennsylvania Human Relations Act to serve the Human Relations Commission with a copy of the Court complaint. This copy must be served on the Commission at the same time you file it in Court. The copy is to be sent to the investigator assigned to your case.

If you have any questions concerning this matter, please feel free to contact the investigator who is handling your case.

Sincerely,
Enforcement Division
PA Human Relations Commission

cc: Robert J. Birch, Esquire
P.O. Box 1133
North Wales, PA 19454

---